## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 18, 2022**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| **RICHARD MASTERS,** | : | |
| | : | **18 U.S.C. § 371** |
| Defendant. | : | **(Conspiracy to Defraud the United** |
| | : | **States and to Commit Offenses** |
| | : | **Against the United States)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act Violations)** |
| | : | |
| | : | **18 U.S.C. § 1956** |
| | : | **(Money Laundering)** |

## I N D I C T M E N T

The Grand Jury charges that, at times material to this Indictment:

### COUNT ONE
(Conspiracy to Defraud the United States and to
Commit Offenses Against the United States)

At all times material to this Indictment:

### INTRODUCTION

1.      TANGO (International Maritime Organization ("IMO") No. 1010703) (the

"TANGO"), is a luxury motor yacht, building of which was completed in or around March 2011.

According to legal record, TANGO was registered in the Cook Islands and was owned by CO-

CONSPIRATOR 1, a British Virgin Islands shell corporation. Since in or around November 2018,

TANGO was managed by CO-CONSPIRATOR 2, a Spanish company.

2.      In reality, TANGO's ultimate beneficial owner was Sanctioned Person 1, a Russian national and head of a Russian conglomerate with interests in oil, energy, and telecommunications sectors. Sanctioned Person 1 had an interest in TANGO and the financial transactions for TANGO's benefit ultimately benefitted Sanctioned Person 1. As described further herein, CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 facilitated the operation of TANGO through the use of U.S. companies and through the U.S. financial system, all while attempting to obfuscate Sanctioned Person 1's involvement in the vessel. The working mechanisms of TANGO, to include its technology, weather forecasting, and computing systems, as well as the trappings of TANGO, to include its satellite television, certain luxury items and teleconferencing software, were all U.S. origin products and services supplied by U.S. companies for the benefit of Sanctioned Person 1.

3.      On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Sanctioned Person 1 as a Specially Designated National, as further described herein. Even before the designation, Sanctioned Person 1's U.S. dollar financial transactions were monitored by U.S. financial institutions as part of their required "Know Your Customer" controls.

4.      Due to the scrutiny of U.S. banks and their financial controls, and as a result of the Treasury Department's sanctions, among other concerns, Sanctioned Person 1's agents, employees, and contractors engaged in a scheme to obfuscate Sanctioned Person 1's ownership interest in TANGO and otherwise to obfuscate TANGO's connection to U.S. dollar transactions and U.S. businesses. Specifically:

    a. Between in or around 2011 and the present, Sanctioned Person 1's agents, employees, and contractors used layers of shell companies, intermediaries, and bank accounts in multiple countries to obfuscate Sanctioned Person 1's association

with and ownership of TANGO, and therefore caused false information regarding the same to be sent to U.S. banks processing U.S. dollar transactions for TANGO.

b. From on or about April 6, 2018, to the present, Sanctioned Person 1's agents, employees, and contractors used third-party intermediaries to make U.S. dollar payments for TANGO, invoiced bills for TANGO under false names and false terms, and other engaged in other artifices, in order to cause U.S. financial institutions to process U.S. dollar transactions, and further transacted with U.S. businesses, all in violation of the Treasury Department sanctions.

5. The aforementioned conduct enabled Sanctioned Person 1 to evade the Treasury Department's "Know Your Customer" regulations applicable to U.S. financial institutions and the reporting of the aforementioned transactions to the Treasury Department.

6. Furthermore, the aforementioned conduct caused U.S. financial institutions to process transactions, including correspondent banking transactions, on behalf of TANGO, which, had these financial institutions known of the true beneficiary of the payments, *i.e.*, Sanctioned Person 1, they would not have otherwise processed or would have investigated.

7. The aforementioned conduct caused U.S. companies to provide good and services to Sanctioned Person 1 and TANGO, enabling Sanctioned Person 1 to evade the U.S. sanctions.

8. Ultimately, TANGO continued to operate as a luxury yacht with the full array of services and luxury goods available to it, supported by hundreds of thousands of dollars of illegally-obtained U.S. services and U.S. financial transactions, and all for the benefit of Sanctioned Person 1.

**BACKGROUND**

*International Emergency Economic Powers Act*

9.      The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

10.      In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine.  To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria.  These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities.  Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

11.      The national emergency declared in Executive Order 13660 with respect to the

4

situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2022.

12.     The President on multiple occasions expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders." Additionally, Executive Order 14065, issued on February 21, 2022, expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic or Luhansk People's Republic regions of Ukraine contradicts Russia's commitments under the Minsk agreements and further threatens the peace, stability, sovereignty, and territorial integrity of Ukraine.

13.     The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

14.     To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R.

§ 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the SDN and Blocked Persons List (the "SDN List"), which is published on OFAC's public website. *Id.* n.1.

15.     Unless otherwise authorized or exempt, transactions by U.S. persons (including U.S. financial institutions) or in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Ukraine-Related Executive Orders.

   a.   As defined, "an interest in property" means "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 589.304.

   b.   As defined, "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.308.

16.     On or about April 6, 2018, OFAC designated Sanctioned Person 1 as an SDN pursuant to the Ukraine-Related Executive Orders.  In particular, OFAC designated Sanctioned Person 1 pursuant to Executive Order 13662 for operating in the energy sector of the Russian Federation economy.  Sanctioned Person 1 was redesignated by OFAC on or about March 11, 2022, pursuant to Executive Order 14024 for having acted or purported to act for or on behalf of, directly or indirectly, the Government of the Russian Federation, and also for operating or having

operated in the technology sector of the Russian Federation economy.

17.     An individual or entity is prohibited from obtaining or providing U.S. funds, goods, or services for the benefit of an SDN without first having obtained a license from OFAC. The Department of the Treasury and OFAC's licensing authority were located in Washington, D.C. Failure to obtain a license is a violation of IEEPA, 50 U.S.C. § 1705(a).

### Correspondent Banking and the Bank Secrecy Act

18.     Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

19.     According to the Treasury Department, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

20.     The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial

institutions are not used to avoid sanctions programs administered by OFAC. Pursuant to these programs, U.S. financial institutions block correspondent banking transactions where an SDN is listed as the sender of the transaction, unless an OFAC license is provided for the transaction.

21.    The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* in furtherance of its mission to safeguard the U.S. financial system. Under the Bank Secrecy Act, financial institutions are required to assist U.S. government agencies in detecting and preventing money laundering, including reporting suspicious activity that might signal criminal activity (*e.g.*, money laundering, tax evasion). Additionally, an amendment to the Bank Secrecy Act incorporates provisions of the USA PATRIOT Act, which requires every bank to adopt a customer identification program (*i.e.*, Know Your Customer ("KYC")) as part of its Bank Secrecy Act compliance program. 12 C.F.R. § 21.11; 12 C.F.R. § 21.21.

22.    FinCEN has issued guidance to U.S. financial institutions related to reporting of suspicious activity related to Russia, including:

  a.  In July 2000, FinCEN warned U.S. financial institutions "of serious deficiencies in the counter-money laundering systems of the Russian Federation." *See* FinCEN Advisory 25, Transactions Involving the Russian Federation (July 2020). Among other things, the Advisory warned that "Russia suffers from serious systemic problems. Russia lacks comprehensive counter-money laundering laws and regulations that meet international standards."

  b.  In April 2008, FinCEN instructed U.S. financial institutions that, "consistent with the standard for reporting suspicious activity as provided for in 31 C.F.R. part 103, if a financial institution knows, suspects, or has reason to suspect that a transaction

8

involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or other violation of law or regulation, the financial institution should then file a Suspicious Activity Report" ("SAR"). FinCEN, FIN-2008-G005, Guidance to Financial Institutions on Filing Suspicious Activity Reports Regarding the Proceeds of Foreign Corruption (April 17, 2008).

c. In August 2017, FinCEN warned U.S. financial institutions about the use of shell companies in order to "obscure the illicit origin of . . . funds." *See* FinCEN, FIN-2017-A003, Advisory to Financial Institutions and Real Estate Firms and Professionals (Aug. 22, 2017). "Shell companies can often be formed without disclosing the individuals that ultimately own or control them (*i.e.*, their beneficial owners) and can be used to conduct financial transactions without disclosing their true beneficial owners' involvement. Criminals abuse this anonymity to mask their identities, involvement in transactions, and origins of their wealth, hindering law enforcement efforts to identify individuals behind illicit activity."

d. In June 2018, FinCEN warned U.S. financial institutions that "[f]oreign corrupt PEPs ["politically exposed persons"], through their facilitators, may amass fortunes through the misappropriation of state assets and often exploit their own official positions to engage in . . . money laundering, embezzlement of state funds, and other corrupt activities." *See* FinCEN, FIN-2018-A003, Advisory on Human Rights Abuses Enabled by Corrupt Senior Foreign Political Figures and Their Financial Facilitators (June 12, 2018). "PEP facilitators commonly use shell companies to obfuscate ownership and mask the true source of the proceeds of corruption."

## THE CO-CONSPIRATORS

23.     CO-CONSPIRATOR 1 was a British Virgin Islands-based corporation that was listed as the owning company of TANGO on legal filings. CO-CONSPIRATOR 1 itself was owned by other entities, all of which traced back to or were connected to Sanctioned Person 1:

      a.  Entity 1, a Panamanian corporation, was an owner of CO-CONSPIRATOR 1. Entity 1 was wholly owned by Entity 2, a Panamanian foundation. Entity 3, a British Virgin Islands corporation, was the beneficiary of Entity 2. Entity 3 was wholly owned by Sanctioned Person 1.

      b.  Entity 4, a Panamanian corporation, was an owner of CO-CONSPIRATOR 1. Entity 4 was owned by Entity 5, a Russian corporation, allegedly owned by Individual 1, a Russian national and employee of Sanctioned Person 1. Until in or around May 2022, Entity 5 was owned by Entity 6, a Russian corporation, which shared a similar name to a Russian corporation owned by Sanctioned Person 1. In or around May 2022, Entity 6 was purchased by Entity 7, a Russian corporation that was owned by Sanctioned Person 1.

      c.  In or around 2014, Financial Institution 1, a foreign bank, made a loan to Sanctioned Person 1 for TANGO. In exchange, Sanctioned Person 1 provided a $5,000,000 U.S. dollar collateral note from Entity 1 and CO-CONSPIRATOR 1 caused shares of its stock in TANGO to be transferred to Financial Institution 1. Financial Institution 1 no longer holds any ownership interest in TANGO.

24.     CO-CONSPIRATOR 2 was a yacht management company located in Palma de Mallorca, Spain, which provided services to luxury yacht TANGO from at least in or around November 2018 to the present.

25.     RICHARD MASTERS was a United Kingdom national, and founder and director of CO-CONSPIRATOR 2 at all times relevant to this Indictment. MASTERS directed CO-CONSPIRATOR 2 employees, including TANGO EMPLOYEE A and TANGO EMPLOYEE B.

26.     CO-CONSPIRATOR 4 was a Russian and Swiss national who has served in senior positions in multiple companies belonging to or controlled by Sanctioned Person 1. CO-CONSPIRATOR 4 was the attorney-in-fact for CO-CONSPIRATOR 1. CO-CONSPIRATOR 4 was also an authorized signatory of Entity 1. CO-CONSPIRATOR 4 was also employed by Entity 8, a Cypriot company, which bears an almost identical name and appears to be affiliated with Entity 6. CO-CONSPIRATOR 4 directed TANGO's agents and employees, to include CO-CONSPIRATOR 2, TANGO EMPLOYEE A, and TANGO EMPLOYEE B on behalf of Sanctioned Person 1.

27.     TANGO EMPLOYEE A was a senior employee of TANGO with management responsibilities.

28.     TANGO EMPLOYEE B was a senior employee of TANGO with management responsibilities.

### *Knowledge*

29.     CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, and CO-CONSPIRATOR 4 knew that Sanctioned Person 1 was the true beneficial owner of TANGO and that TANGO was being operated solely for the exclusive use of Sanctioned Person 1, his family, and his friends.

30.     From on or about April 6, 2018, to the present, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, and CO-CONSPIRATOR 4 knew that Sanctioned Person 1 had been sanctioned by the U.S. Department of the Treasury, and as a result, that transactions by U.S.

persons (including U.S. financial institutions) or in the United States for Sanctioned Person 1 were prohibited without prior authorization from the United States.

## JURISDICTION AND VENUE

31.     Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia.

32.     Additionally, acts referred to in this Indictment were begun and committed outside of the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States.  Pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

## THE CONSPIRACY

33.     Beginning at least in or around March 2011, the exact date being unknown to the Grand Jury, through on or about April 4, 2022, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, CO-CONSPIRATOR 4, and others known and unknown to the Grand Jury, in the District of Columbia and elsewhere, knowingly combined, conspired, and agreed together and with each other:

   a.   to defraud the United States and its agency, the Department of the Treasury, by interfering with and obstructing a lawful government function to wit, Treasury's "Know Your Customer" regulations applicable to U.S. financial institutions on transactions related to TANGO and reporting by U.S. financial institutions of the same to the Department of the Treasury, all of which caused U.S. financial institutions to process U.S. dollar payments on behalf of TANGO, done by means of deceit, craft, trickery, and dishonesty; and

   b.   to commit a crime against the United States, namely, violations of 50 U.S.C.

§ 1705, that is, exporting and causing the export of goods and services by U.S. persons (including U.S. financial institutions) and within the United States to a sanctioned person without authorization or a license.

### Goals

34.　The goals and purposes of the conspiracy were, among others:

　　a.　to permit TANGO to operate as a luxury yacht with the full availability of all desired services necessary to the maintenance and enjoyment of the yacht by Sanctioned Person 1;

　　b.　to prevent U.S. financial institutions from investigating transactions related to TANGO and Sanctioned Person 1's connection thereto, and thereby undermining the Department of the Treasury's "Know Your Customer" regulations;

　　c.　to prevent U.S. dollar transactions from being stopped, blocked, or frozen by U.S. financial institutions;

　　d.　to pay in U.S. dollars for products and services associated with TANGO that were for Sanctioned Person 1's benefit;

　　e.　to transact with U.S. companies for products and services associated with TANGO that were for Sanctioned Person 1's benefit; and

　　f.　to evade the regulations, prohibitions, and licensing requirements of U.S. law.

### Manner and Means

35.　It was further a part of the conspiracy that the co-conspirators used the following manner and means, among others, to achieve the goals of the conspiracy:

　　a.　CO-CONSPIRATOR 1 and CO-CONSPIRATOR 4 used shell corporations to obfuscate Sanctioned Person 1's beneficial ownership of TANGO.

b. CO-CONSPIRATOR 1, CO-CONSPIRATOR 4, and others caused payments to be sent between these shell corporations to obfuscate Sanctioned Person 1's beneficial ownership of TANGO.

c. CO-CONSPIRATOR 2, MASTERS, TANGO EMPLOYEE A, TANGO EMPLOYEE B, and others listed and caused to be listed a false vessel name and opaque reference numbers on invoices and other payment documents to hide TANGO's connection to those banking transactions, and instructed others to do the same.

d. CO-CONSPIRATOR 2, MASTERS, and others transmitted and caused to be transmitted to U.S. financial institutions false information about U.S. dollar transactions made on behalf of TANGO.

e. CO-CONSPIRATOR 2, TANGO EMPLOYEE A, TANGO EMPLOYEE B, and other conspirators used themselves and third-parties to process payments for TANGO with U.S. businesses and U.S. financial institutions.

f. CO-CONSPIRATOR 2, TANGO EMPLOYEE A, TANGO EMPLOYEE B, and others instructed U.S. businesses to bill TANGO in currencies other than the U.S. dollar to avoid scrutiny of U.S. financial institutions.

g. CO-CONSPIRATOR 2, TANGO EMPLOYEE A, TANGO EMPLOYEE B, and others commingled U.S. dollar payments for TANGO with that of other vessels, including the registration fees for TANGO.

h. CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, CO-CONSPIRATOR 4, TANGO EMPLOYEE A, TANGO EMPLOYEE B, and others used e-mail accounts to communicate about the payment schemes, use of U.S.

14

companies, and provision of false information.

### *Overt Acts*

36.     In furtherance of this conspiracy and to accomplish its goals, the following overt

acts, among others, were committed in the District of Columbia and elsewhere:

### *Use of Shell Corporations*

a.   On or about October 3, 2018, TANGO EMPLOYEE B emailed CO-
CONSPIRATOR 4 and TANGO EMPLOYEE A a chart of the holding companies
of CO-CONSPIRATOR 1, and suggested that Sanctioned Person 1's "indirect"
interest in Entity 2 would assist in evasion of sanctions.

b.   On or about August 30, 2019, CO-CONSPIRATOR 4 emailed MASTERS stating
that CO-CONSPIRATOR 2 could "organize payments" in U.S. dollars "while
being funded in [Euros]."

c.   In or around September 2019, CO-CONSPIRATOR 4 and CO-CONSPIRATOR 1
represented that CO-CONSPIRATOR 1's ownership structure had changed,
causing it to be owned by an additional shell corporation, Entity 5. Entity 5, in turn,
was purported by CO-CONSPIRATOR 4 to be owned by Individual 1, a Russian
national and employee of Sanctioned Person 1. This alleged "change" in ownership
structure was all done in an effort to hide Sanctioned Person 1's beneficial
ownership of TANGO. Sanctioned Person 1 continued to be the sole beneficial
owner and user of TANGO.

d.   On or about September 27, 2019, CO-CONSPIRATOR 4 emailed TANGO
EMPLOYEE A, TANGO EMPLOYEE B, and a CO-CONSPIRATOR 2 employee
information on CO-CONSPIRATOR 1's letterhead showing that Sanctioned

Person 1 was merely the "user" of TANGO, but purportedly not the owner, and that Individual 1 instead was the true owner.

e. On or about September 27, 2019, TANGO EMPLOYEE A emailed CO-CONSPIRATOR 4, TANGO EMPLOYEE B, and a CO-CONSPIRATOR 2 employee to describe "discussions" TANGO EMPLOYEE A had about how to "circumvent" Sanctioned Person 1 "having his name on" TANGO's letter of authority.

f. On or about March 9, 2022, CO-CONSPIRATOR 4 instructed a CO-CONSPIRATOR 2 employee only to disclose Individual 1's involvement with TANGO to companies requesting information about the shipowner of TANGO.

**Payments Between Shell Companies**

g. On or about December 22, 2017, Sanctioned Person 1 sent a wire payment to CO-CONSPIRATOR 1 for $1,300,000, which transited through a U.S. correspondent bank in Connecticut, a payment that was used to fund TANGO-related expenses.

h. On or about March 21, 2018, CO-CONSPIRATOR 1 sent a wire payment for $43,520 to Entity 6, a Russian corporation owned by Sanctioned Person 1 and controlled by Sanctioned Person 1's employees, which transited through a U.S. correspondent bank.

**Use of False Vessel Name for Tango**

i. In or around October 2018, MASTERS told CO-CONSPIRATOR 2 employees, specifically TANGO EMPLOYEE B, that CO-CONSPIRATOR 2 would use a false name for TANGO, specifically "Fanta" to do business on behalf of TANGO.

j. On or about November 14, 2018, a CO-CONSPIRATOR 2 employee sent TANGO

EMPLOYEE A and TANGO EMPLOYEE B an editable invoice document for TANGO expenses, which used the term "Fanta" as a reference in place of TANGO, and stated, "As per your request find enclosed the editable invoicing doc ready to be used for your Head of Departments."

k. On or about November 16, 2018, TANGO EMPLOYEE A instructed other TANGO staff and crew to use the term "Fanta" for invoices related to TANGO, and "to avoid any mention of Tango."

l. On or about November 13, 2018, a CO-CONSPIRATOR 2 employee emailed a United Kingdom insurance company and instructed, "Please note that if you do ever have to make a transfer to the bank account I gave you, Please make absolutely certain that there is no mention of 'Tango'. Reference should read 'Fanta'." Two days later, the email was forwarded to the founder and director of CO-CONSPIRATOR 2. MASTERS then sent the email to TANGO EMPLOYEE A and TANGO EMPLOYEE B and attached a copy of an agreement between CO-CONSPIRATOR 2 and the United Kingdom insurance company.

m. On or about November 28, 2018, a CO-CONSPIRATOR 2 employee affirmed to TANGO EMPLOYEE B that they should use TANGO or "Fanta" on the invoices for services "depending on destination" of the yacht.

n. On or about December 6, 2018, CO-CONSPIRATOR 2 contracted for internet and computing services for TANGO with a U.S. company (hereinafter "U.S. Internet Service Provider (ISP)").

o. On or about September 23, 2020, a CO-CONSPIRATOR 2 employee forwarded to MASTERS a copy of an executed agreement between CO-CONSPIRATOR 2 and

U.S. ISP for services to be provided to TANGO, which listed all payments in U.S. dollars.

p. On or about the following dates, CO-CONSPIRATOR 2, on behalf of TANGO, paid invoices to U.S. ISP, many of which referenced "Fanta":

| Sub-¶ | Date of Payment | Amount in Euros |
|---|---|---|
| 1 | 12/6/2018 | 583.27 |
| 2 | 12/6/2018 | 645.08 |
| 3 | 1/10/2019 | 1,107.98 |
| 4 | 2/7/2019 | 34,911.45 |
| 5 | 3/7/2019 | 370.94 |
| 6 | 4/5/2019 | 972.07 |
| 7 | 4/17/2019 | 1,696.19 |
| 8 | 6/14/2019 | 846.08 |
| 9 | 6/18/2019 | 641.63 |
| 10 | 8/1/2019 | 950.32 |
| 11 | 8/2/2019 | 4,037.87 |
| 12 | 8/13/2019 | 27,400.93 |
| 13 | 8/13/2019 | 1,956.84 |
| 14 | 8/21/2019 | 1,643.07 |
| 15 | 9/18/2019 | 1,142.97 |
| 16 | 11/1/2019 | 4,722.99 |
| 17 | 11/12/2019 | 1,035.14 |
| 18 | 11/27/2019 | 22,254.21 |
| 19 | 11/27/2019 | 554.99 |
| 20 | 12/20/2019 | 1,461.18 |
| 21 | 1/13/2020 | 15,201.49 |
| 22 | 2/14/2020 | 721.45 |
| 23 | 3/12/2020 | 7,274.37 |
| 24 | 3/12/2020 | 9,972.81 |
| 25 | 3/25/2020 | 859.14 |
| 26 | 4/2/2020 | 2,906.35 |
| 27 | 4/6/2020 | 1,302.12 |
| 28 | 8/11/2020 | 619.43 |
| 29 | 9/22/2020 | 715.65 |
| 30 | 11/17/2020 | 653.42 |
| 31 | 12/21/2020 | 661.83 |
| 32 | 1/7/2021 | 1,158.84 |
| 33 | 2/3/2021 | 621 |
| 34 | 3/2/2021 | 14,790.00 |

| 35 | 3/24/2021 | 1,424.00 |
| 36 | 5/30/2021 | 182 |
| 37 | 6/30/2021 | 465 |
| 38 | 6/30/2021 | 123.2 |
| 39 | 6/30/2021 | 1,140.83 |
| 40 | 11/12/2021 | 716,01 |
| 41 | 12/9/2021 | 14,675.20 |

q. On or about December 22, 2020, CO-CONSPIRATOR 2 wired $39,340 to a five-star water villa resort in the Maldives for the benefit of TANGO guests, including Sanctioned Person 1, and included a bank reference to "CO-CONSPIRATOR 1" as opposed to TANGO, which transited through a U.S. correspondent bank.

r. On or about April 21, 2021, MASTERS approved a plan by a CO-CONSPIRATOR 2 employee to falsify business records and change references from TANGO to Fanta, in order for the business records to be submitted to a financial institution processing a payment related to TANGO.

s. On or about August 21, 2021, CO-CONSPIRATOR 2 wired $2,630.50 to a U.S. manufacturer of luxury robes with wiring instructions that included a reference "Fanta".

t. In or around the fall of 2021, CO-CONSPIRATOR 2 created a budget for TANGO, which included computing services provided by U.S. ISP, which was approved by CO-CONSPIRATOR 4.

u. On or about March 22, 2022, U.S. ISP sent CO-CONSPIRATOR 2 and TANGO EMPLOYEE A a shipment of computers for use on TANGO, which were purchased by CO-CONSPIRATOR 2.

*Use of Third Parties to Facilitate Payments*

v.  On or about May 26, 2018, TANGO EMPLOYEE A emailed TANGO EMPLOYEE B and instructed him to put a TANGO U.S. dollar expense on TANGO EMPLOYEE A's "USD debit card."

w.  On or about November 30, 2020, TANGO EMPLOYEE A instructed CO-CONSPIRATOR 2 employees about products purchased from the California company for TANGO and suggested the U.S. dollar charges be put on TANGO EMPLOYEE A's personal credit card.

x.  On or about February 24, 2021, TANGO EMPLOYEE A emailed an employee at U.S. ISP asking U.S. ISP to pay for U.S. software and then invoice the charge to CO-CONSPIRATOR 2, in order for TANGO to avoid directly contracting for the U.S. software.

y.  On or about February 24, 2021, TANGO EMPLOYEE B emailed an employee of a U.S. company providing computing services to TANGO, stating that bills related to TANGO could not be paid as it would result in a U.S. wire transfer, and requested instead the payment be invoiced through a third party.

*Commingling*

z.  On or about the following dates, Company A paid for registration services of TANGO with the Cook Islands registry, commingling the payments with that of other vessels:

| Sub-¶ | Date | Amount in USD |
|---|---|---|
| 1 | 1/22/2019 | $180.00 |
| 2 | 4/2/2019 | $1,000.00 |
| 3 | 6/5/2019 | $16,550.00 |
| 4 | 6/30/2019 | $200.00 |
| 5 | 6/30/2019 | $200.00 |

| 6 | 6/30/2019 | $200.00 |
|---|---|---|
| 7 | 6/30/2019 | $200.00 |
| 8 | 6/30/2019 | $200.00 |
| 9 | 6/30/2019 | $200.00 |
| 10 | 6/30/2019 | $200.00 |
| 11 | 6/30/2019 | $200.00 |
| 12 | 6/30/2019 | $200.00 |
| 13 | 7/8/2019 | $150.00 |
| 14 | 8/7/2019 | $100.00 |
| 15 | 8/7/2019 | $100.00 |
| 16 | 9/2/2019 | $125.00 |
| 17 | 9/3/2019 | $3,055.00 |
| 18 | 9/6/2019 | $300.00 |
| 19 | 9/16/2019 | $3,366.47 |
| 20 | 10/24/2019 | $360.00 |
| 21 | 2/29/2020 | $100.00 |
| 22 | 6/30/2020 | $150.00 |
| 23 | 8/24/2020 | $864.00 |
| 24 | 11/2/2020 | $150.00 |
| 25 | 4/27/2021 | $360.00 |
| 26 | 6/3/2021 | $200.00 |
| 27 | 6/13/2021 | $330.00 |
| 28 | 7/13/2021 | $1,500.00 |
| 29 | 11/30/2021 | $360.00 |
| 30 | 12/1/2021 | $6,700.00 |
| 31 | 12/9/2021 | $360.00 |
| 32 | 12/18/2021 | $360.00 |
| 33 | 1/13/2022 | $360.00 |
| 34 | 1/17/2022 | $180.00 |

(**Conspiracy to Defraud the United States and to Commit an Offense Against the United States,** in violation of Title 18, United States Code, Section 371, and Title 50, United States Code, Section 1705)

## COUNTS TWO THROUGH EIGHT
(International Emergency Economic Powers Act)

37.     The allegations in Paragraphs 1 through 36 of this Indictment are incorporated and re-alleged by reference herein.

38.     As described in Paragraph 36 above, U.S. ISP is a U.S.-based internet service

provider. Between in or around January 2018 and in or around March 2022, U.S. ISP provided internet, computing services, email hosting, and email storage for TANGO, which was billed monthly.

39.     U.S. Company 1 is a manufacturer of luxury robes located in the United States. The company sold 29 robes in or around August 2020 and an additional 29 robes in or around August 2021, all embroidered with TANGO's logo. The order placed in 2021 contained instructions from CO-CONSPIRATOR 2 to reference "Fanta" on the invoice.

40.     U.S. Company 2 sells software designed to assist yachts with voyage planning and route optimization, located in the United States. The company sold its software to TANGO, billing monthly from in or around April 2018 until in or around January 2022.

41.     U.S. Company 3 is a provider of videoconferencing software located in the United States. The company sold its services to TANGO, billing monthly from in or around September 2020 until in or around March 2022.

42.     During the relevant time periods, no license was obtained from OFAC to export these U.S. goods and services from the United States for the benefit of TANGO and Sanctioned Person 1.

43.     On or about the dates specified below, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, CO-CONSPIRATOR 4, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, did knowingly and willfully export, attempt to export, and cause U.S. persons and entities, as listed herein, to export and attempt to export goods and services, as listed below, for the benefit of Sanctioned Person 1, without first having obtained authorization or a license from the Department of Treasury:

| Count | On or About Date | U.S. Person | Approximate Amount |
|-------|------------------|-------------|--------------------|
| 2 | 02/07/2019 | U.S. ISP | €34,911.45 |
| 3 | 08/13/2019 | U.S. ISP | €27,40.93 |
| 4 | 11/27/2019 | U.S. ISP | €22,254.21 |
| 5 | 02/29/2020 | U.S. Company 2 | $180.00 |
| 6 | 09/03/2020 | U.S. Company 1 | $2,624.35 |
| 7 | 08/31/2021 | U.S. Company 1 | $2,630.50 |
| 8 | 03/22/2022 | U.S. Company 3 | £14.39 |

(**International Emergency Economic Powers Act**, in violation of Title 50, United States Code, Section 1705)

## COUNTS NINE THROUGH FOURTEEN
(Laundering of Money Instruments)

44.     The allegations in Paragraphs 1 through 36 of this Indictment are incorporated and re-alleged by reference herein.

45.     Beginning on or about April 6, 2018, through on or about April 4, 2022, as specified below, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, MASTERS, CO-CONSPIRATOR 4, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, and cause the transportation, transmission, and transfer of a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit: the export of services by U.S. persons, including U.S. financial institutions, and within the United States for the benefit of Sanctioned Person 1 without prior authorization or a license from OFAC, as described in Count One, including as follows:

| Count | On or About Date | For | Approximate Amount |
|---|---|---|---|
| 9 | 06/05/2019 | Registration Fees | $16,550.00 |
| 10 | 09/03/2019 | Registration Fees | $3,055.00 |
| 11 | 09/16/2019 | Registration Fees | $3,366.47 |
| 12 | 12/22/2020 | Over Water Villa Resort | $39,340.00 |
| 13 | 12/23/2020 | Mooring Fees Maldives | $3,300.05 |
| 14 | 12/30/2020 | Mooring Fees Maldives | $7,948.00 |

(**Money Laundering**, in violation of Title 18, United States Code, Section 1956(a)(2)(A))

## FORFEITURE ALLEGATION

1.     The allegations contained in Counts One through Fourteen of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of a conspiracy to defraud the United States or to violate IEEPA, in violation of Title 18, United States Code, Section 371, or violations of IEEPA, 50 U.S.C. § 1701 et seq., defendant MASTERS shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

   a.   Luxury Yacht Tango with International Maritime Organization number 1010703.

   b.   All fees, payments, and monies derived from services performed on behalf of TANGO.

3.     The allegations contained in Counts One through Fourteen of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

4.      Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, defendant MASTERS shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense. The property to be forfeited includes, but is not limited to, the following:

  a. Luxury Yacht Tango with International Maritime Organization number 1010703.

  b. All fees, payments, and monies derived from services performed on behalf of TANGO.

5. If any of the property described above, as a result of any act or omission of defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

*Matthew M. Graves / SM*

Attorney of the United States in
and for the District of Columbia